CANTIL-SAKAUYE, C. J., Concurring.
We properly reverse the judgment of death based on the holding of Gray v. Mississippi (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045] {Gray). I write separately only to observe that the rationale for Gray’s rule has become somewhat unclear, and to suggest that clarification of the theory underlying the rule would provide guidance in identifying the breadth of circumstances in which the rule applies.
The general rule is that, absent a showing of prejudice, an erroneous excusal of a prospective juror for cause does not mandate the reversal of judgment. This rule is based on the principle that a-“[d]efendant has a right to jurors who are qualified and competent, not to any particular juror.” (People v. Holt (1997) 15 Cal.4th 619, 656 [63 Cal.Rptr.2d 782, 937 P.2d 213].) But as noted in the majority opinion, under existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person’s views concerning the death penalty automatically compels the reversal of the penalty phase judgment without any inquiry as to whether the error may have prejudiced defendant’s penalty determination. (Gray, supra, 481 U.S. at pp. 659-667 (Gray) (opn. of the court); id. at pp. 667-668 (plur. opn. of Blackmun, J.); id. at p. 672 (cone. opn. of Powell, J.).)
In Gray, supra, 481 U.S. 648, the trial court declined to excuse for cause a number of prospective jurors who expressed opposition to the death penalty, and the prosecutor exercised peremptory challenges to excuse those jurors. By the time Mrs. Bounds entered the jury box, the prosecutor had exhausted the state’s peremptory challenges. Although, after some confusion, the trial court concluded Mrs. Bounds was capable of voting to impose the death penalty, the prosecutor asked the court to afford the state another peremptory challenge to exercise against Mrs. Bounds, arguing that the court’s prior denials of the state’s challenges for cause were erroneous and thereby caused the state to prematurely exhaust its peremptory challenges. The trial court at this point expressed its belief that it had erred in denying a number of the prosecutor’s prior challenges for cause, but declined to revisit those earlier rulings. It also declined to afford the prosecutor more peremptory challenges. Instead, it erroneously concluded that Mrs. Bounds was indecisive and excused her for cause. {Gray, supra, at pp. 651-656.)
*841 The high court granted review to address “whether the improper excusal of a juror for cause can be harmless.” (Gray, supra, 481 U.S. at p. 657.) In response to the contention that the erroneous excusal was harmless because the prosecutor claimed that he would have exercised a peremptory challenge against Mrs. Bounds if he had not exhausted his peremptory challenges, the majority reasoned that “[e]ven if one is to believe the prosecutor’s statement that if his motion to remove [the prospective juror] for cause had been denied and he had had a peremptory remaining, he would have used it to remove her, we cannot know whether in fact he would have had this peremptory challenge left to use. That is, if the court had granted one or more of his earlier motions to remove for cause, the prosecutor may have used his peremptory challenges on other jurors whom he did not strike when he had fewer peremptory challenges to exercise. The nature of the jury selection process defies any attempt to establish that an erroneous Witherspoon-Witt exclusion of a juror is harmless.” (Id. at p. 665; see id. at p. 670 (cone. opn. of Powell, J.).) The Gray majority rejected the argument that “the crucial question in the harmless-error analysis is whether a particular prospective juror is excluded from the jury due to the trial court’s erroneous ruling,” and, instead, emphasized that “the relevant inquiry is ‘whether the composition of the jury panel as a whole could possibly have been affected by the trial court’s error ....’” (Id. at p. 665.)
A majority in Gray could not agree on a response to the state’s argument that the court should “treat the erroneous exclusion as an isolated incident without prejudicial effect if it cannot be said that the ultimate panel did not fairly represent the community anyway.” (Gray, supra, 481 U.S. at p. 661.) According to the plurality opinion, the erroneous exclusion of “a scrupled, yet eligible, venire member” cannot be viewed as “an isolated incident,” in part “because it appears that prosecutors often use peremptory challenges” in order “to remove all venire members who expressed any degree of hesitation against the death penalty.” (Gray, supra, 481 U.S. at pp. 667-668 (plur. opn. of Blackmun, J.).) Therefore, according to the plurality in Gray, an erroneous Witherspoon-Witt excusal further slants the jury in favor of a death sentence, thereby affecting the impartiality of the panel, which “goes to the very integrity of the legal system” and implicates a defendant’s “constitutional right not to be sentenced by a ‘tribunal organized to return a verdict of death.’ ” (Gray, supra, at p. 668 (plur. opn. of Blackmun, J.), quoting Witherspoon v. Illinois (1968) 391 U.S. 510, 521 [20 L.Ed.2d 776, 88 S.Ct. 1770]; see Wainwright v. Witt (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844].)
Justice Powell supplied the fifth vote in Gray to constitute a majority for the application of an automatic reversal rule. But he expressly disagreed with a portion of the plurality’s reasoning. Justice Powell agreed that the court could not assume that tire prosecutor would have exercised a peremptory *842 challenge against Mrs. Bounds, but he rejected the plurality’s view that the prosecutor’s use of peremptory challenges to remove prospective jurors who expressed hesitation concerning the death penalty was relevant to the issue of whether the erroneous excusal affected the impartiality of the jury, because a prosecutor is lawfully entitled to “remove peremptorily jurors whom he believes may not be willing to impose lawful punishment.” (Gray, supra, 481 U.S. at p. 671 (cone. opn. of Powell, J.).) Therefore, Justice Powell rejected the idea that the erroneous excusal “was exacerbated by the proper exclusion of other jurors who may have shared her views.”[1] (Gray, at p. 672 (cone, opn. of Powell, J.).) Instead, Justice Powell believed the error was automatically reversible solely because “we cannot know what effect the excluded juror would have had on the panel as a whole.” (Id. at p. 671 (cone. opn. of Powell, J.).)
Consequently, Gray stands for the proposition that Witherspoon-Witt error is reversible per se because the error affects the composition of the panel “ ‘as a whole’ ” (Gray, supra, 481 U.S. at p. 665, italics omitted; see id. at p. 671 (cone. opn. of Powell, J.)) by inscrutably altering how the peremptory challenges were exercised (id. at p. 665; see id. at p. 670 (cone. opn. of Powell, J.)). But the Gray court was unable to articulate any agreement as to why a change in the composition of the panel as a whole jeopardized the defendant’s right to a fair trial, and indeed five justices apparently rejected the claim that the error had the effect of leaning the jury panel in favor of a conviction and death verdict. (Id. at pp. 671-672 (cone. opn. of Powell, J.); id. át p. 679 (dis. opn. of Scalia, J.).) Finally, the Gray majority was unpersuaded by the state’s argument that this Witherspoon-Witt error was harmless in the absence of any evidence that the error caused a biased juror to sit in judgment of the defendant’s case.
One year later, in Ross v. Oklahoma (1988) 487 U.S. 81 [101 L.Ed.2d 80, 108 S.Ct. 2273] (Ross), the high court was faced with the inverse of the situation posed in Gray—the erroneous inclusion, over the defense’s objection, of a prospective juror who stated on voir dire that he would automatically vote to impose the death penalty if he found the defendant guilty. (Ross, supra, at pp. 83-84.) As a result of this error, the defense used its sixth peremptory challenge to remove this prospective juror. The defense eventually exhausted its six remaining challenges, and then objected to the composition of the final jury. (Id. at p. 84.) On appeal, the defendant relied upon *843 Gray and argued that the error unavoidably affected “ ‘the composition of the jury panel as a whole’ ” (Gray, supra, 481 U.S. at p. 665, original italics), thereby requiring reversal. Just as in Gray, the defendant argued that it was impossible to determine how the trial court’s error affected the parties’ exercise of their subsequent peremptory challenges because “had he used his sixth peremptory challenge differently, the prosecution may have exercised its remaining peremptory challenges differently in response, and consequently, the composition of the jury panel might have changed significantly.” (Ross, supra, 487 U.S. at p. 87.)
The Ross majority agreed with the defendant “that the failure to remove [the prospective juror in question] may have resulted in a jury panel different from that which would otherwise have decided the case,” but contrary to the majority’s conclusion in Gray, the high court refused to “accept the argument that this possibility mandates reversal.” (Ross, supra, 487 U.S. at p. 87.) Instead, the Ross majority declined to apply the reasoning articulated in the Gray court’s majority opinion—that an error in ruling on a challenge for cause, which might have affected the ultimate composition of the jury as a whole, always requires reversal.
The majority in Ross criticized the “ ‘ “composition ... as a whole” ’ ” language from Gray, stating, “We think the broad language used by the Gray Court is too sweeping to be applied literally . . . ,” and the court limited its applicability, stating that the language “is best understood in the context of the facts there involved.” (Ross, supra, 487 U.S. at pp. 87-88.) In the course of criticizing the rule articulated in Gray, the Ross majority explained that “the statement that any error which affects the composition of the jury must result in reversal defies literal application” because the remedy to correct such an error, dismissing the venire and starting jury selection anew, creates a scenario in which “the composition of the jury would undoubtedly have been affected by the original error.” (Ross, supra, at p. 87, fn. 2.) The Ross majority then conducted a harmless error analysis and concluded that the error had no prejudicial effect because defendant had failed to show that an unqualified juror had been seated. (Id. at pp. 87-88.)
Given the high court’s conclusion that the Gray majority’s “ ‘ “composition ... as a whole” ’ ” language “is too sweeping to be applied literally” (Ross, supra, 487 U.S. at p. 87), and its limitation of the Gray holding to an improper exclusion under Witherspoon-Witt, it appears the Gray court’s automatic reversal rule lacks any agreed-upon rationale for its application. The errors in Gray and Ross each created uncertainty about how the parties would have used their remaining peremptory challenges and presumably *844 impacted the ultimate composition of the jury panel.[2] If these identical circumstances change the composition of the jury in uncertain ways in both scenarios, then why does Gray require automatic reversal whereas Ross does not? Under this existing precedent, it does not appear to matter that Gray involved a prospective juror with hesitations concerning the death penalty whereas Ross involved a prospective juror who would automatically impose the death penalty.[3]
Ultimately, the difference between Gray and Ross perhaps boils down to a question of policy. Arguably, the Gray rule, by making a single WitherspoonWitt error automatically reversible, best enforces the protections afforded by Witherspoon-Witt during the jury selection process. On the other hand, if a single Witherspoon-Witt error during the jury selection process is tolerable as long as the defendant is ultimately tried by 12 fair jurors, then the Ross harmless error rule should be utilized.
Without additional guidance from the high court as to how WitherspoonWitt error should be evaluated, it is difficult to meaningfully analyze circumstances that may differ slightly from those presented in Gray or Ross. The circumstances of the error presented here—a prospective juror erroneously dismissed based only on her written questionnaire—illustrates the difficulty.
Unlike the errors in Gray or Ross, it is uncertain whether Prospective Juror N.K.’s dismissal had any effect on the composition of the jury. At the outset, N.K. might not have been one of the 57 prospective jurors called into the jury box for questioning. Furthermore, even assuming she would have been questioned in court, N.K. might have been excusable for cause within the *845 dictates of Witherspoon-Witt, or she might have been dismissed for cause for reasons completely unrelated to her views on the death penalty.[4] Alternatively, N.K. may have survived any challenges for cause but might have been subsequently removed by a peremptory challenge lodged by either the prosecution or defense, also for reasons unrelated to her views on the death penalty.[5] Thus, unlike the erroneously excused prospective juror in Gray, who had been called into the jury box after the prosecution had already exhausted its peremptory challenges (Gray, supra, 481 U.S. at p. 653), it is unclear whether the trial court’s Witherspoon-Witt error actually prevented Prospective Juror N.K. from being seated on the jury.[6]
If the ultimate goal animating the high court’s case law in this area is to strictly prohibit any occurrences of Witherspoon-Witt error, regardless of whether the error may have affected the ultimate composition of the jury, then removing N.K. due to an erroneous Witherspoon-Witt determination would be sufficient to justify an automatic reversal. On the other hand, if a single Witherspoon-Witt error during jury selection is tolerable—and especially if it is questionable whether the dismissal affected the ultimate composition of the jury—Prospective Juror N.K.’s erroneous removal would not appear to have affected the fairness of defendant’s trial. Defendant voiced no objection to the composition of the final jury below and makes no argument on appeal that a biased juror sat in judgment of his case.
But without a firm identification of the guiding principles that should govern our scrutiny of an erroneous dismissal of a prospective juror for cause, we are compelled to follow that precedent that is most analogous to the circumstances presented here at the possible expense of sacrificing the finality of our state’s judgments.
*846 Appellate courts around the country would certainly be assisted if the United States Supreme Court were to provide further elucidation on this important subject, but for now, we apply the automatic reversal rule under compulsion of stare decisis and Gray.
Baxter, J., Chin, J., and Corrigan, J., concurred.

 It appears that the dissenters of the Gray court agreed with Justice Powell on this point. Justice Scalia, in a dissent speaking for three other justices, also criticized the plurality’s view that the prosecutor’s use of peremptory challenges to remove life-leaning prospective jurors was relevant to Witherspoon error, explaining that “[s]ince defendants presumably use their peremptory challenges in the opposite fashion, the State’s action simply does not result in juries ‘deliberately tipped toward’ conviction.” (Gray, supra, 481 U.S. at p. 679 (dis. opn. of Scalia, J.).)

 As the majority in Ross acknowledged, one “animating” concern in Gray was “the inability to know to a certainty whether the prosecution could and would have used a peremptory challenge to remove the erroneously excused juror” (Ross, supra, 487 U.S. at p. 88), because, according to the majority in Gray, this circumstance affected the composition of the jury in a manner that defies any attempt to reconstruct how the prosecution would have exercised its peremptory challenges absent the error (Gray, supra, 481 U.S. at p. 665; see id. at p. 670 (cone. opn. of Powell, J.)). In his separate opinion, Justice Liu contends that this circumstance provides a ground of distinction between Gray and Ross. But the majority in Ross acknowledged that the error presented before it also had the effect of altering the composition of that jury panel by affecting how the defense exercised its peremptory challenges. (Ross, supra, at p. 87.) Yet, despite their similar circumstances, the majority in Ross did not provide a reasoned basis for why Ross and Gray each require the application of a different standard of reversible error.

 It is worth noting that the error in Ross, according to the reasoning of the Gray plurality, would also have tipped the jury panel in favor of a death verdict because, had the trial court properly removed the prospective juror in question, the defendant in Ross would not have been compelled to expend a peremptory challenge to remove that prospective juror. This error, therefore, gave the defense one fewer peremptory challenge, thereby depriving the defense of an opportunity to remove a death-leaning prospective juror and, applying the reasoning of the Gray plurality, tilting the panel towards a verdict of death.

 For example, Prospective Juror N.K. wrote on her questionnaire that her ability to concentrate during the trial might be affected by a prolonged absence from her job, and she wrote that she would not be willing to remain as long as necessary to reach a verdict if the trial lasted longer than projected because of her job obligations, especially if the trial lasted longer than 30 days.

 Prospective Juror N.K. had been the victim of a home burglary in which the perpetrator had not been apprehended. Because the instant homicides also involved a home burglary and the evidence demonstrated that defendant was a professional burglar, it seems likely the defense would have considered exercising a peremptory challenge to remove her.

 These circumstances are in stark contrast to those we faced in People v. Stewart (2004) 33 Cal.4th 425 [15 Cal.Rptr.3d 656, 93 P.3d 271], In that case, we concluded that responses to a defective written questionnaire had been used improperly as the basis for removing five prospective jurors for cause because of their views concerning the death penalty. (Id. at p. 451.) That same defective questionnaire also was used to remove another 17 prospective jurors by stipulation of the parties. (Id. at p. 444.) In Stewart, therefore, it is evident that the removal of so many prospective jurors based on a defective questionnaire did have an appreciable impact on the final composition of the jury.